LESLIE WELTER v. CHARLES B. HILL.[1]

June 24, 1896.

Nos. 9995—(254).

**Sale of Crop—When Title Passes.**

Where a crop, to be thereafter raised, harvested, and threshed, was sold before the seed was sown, *held*, the contract of sale was not an executed, but an executory, contract, and on the evidence the jury were not warranted in finding that the title passed until the grain was ready for delivery.

Appeal by defendant from a judgment of the district court for Clay county in favor of plaintiff for $1,092.52, after a trial before Baxter, J., and a jury. Reversed.

*Burnham & Tillotson* and *George S. Grimes*, for appellant.

*C. A. Nye*, for respondent.

CANTY, J. During all the time hereinafter stated one Bodkin was the owner of a certain farm in Clay county, in this state, on which he carried on the business of farming. On March 15, 1894, the Economist Plow Company recovered judgment against him for the sum of $2,102.26 in the district court of that county, and on August 2 of the same year caused execution to be issued thereon and levied on about 100 acres of growing flax which was being raised by Bodkin on this farm. This action was brought by plaintiff, claiming to be the owner of the flax, against the sheriff for the conversion of the same. Plaintiff had a verdict. Defendant's motion for a new trial was denied, and he appeals from the judgment thereafter entered.

[1] Reported in 68 N. W. 26.

65 M.—18

It is assigned as error that the verdict is not sustained by the evidence, and, in our opinion, the assignment is well taken. Plaintiff claims to have purchased the field of flax from Bodkin in the spring, before the seed was sown, and to have received a bill of sale of the same. No bill of sale was produced on the trial, and there never was any apparent change of possession, but Bodkin sowed the flax, apparently as his own. However, no question seems to have been raised, and no issue tried, as to whether there was any actual fraud in the alleged sale, or any constructive fraud, except as it is claimed by appellant that the evidence is conclusive that the transaction, if there was any, was a chattel mortgage, and not an absolute sale; and that it is void as against creditors, because never filed with the town clerk as required by G. S. 1894, §§ 4129, 4130. On this question we will not pass, as we are of the opinion that the next question disposes of the case.

Appellant contends that, conceding the contract to be in the nature of a sale, and not of a mortgage, still the evidence does not warrant a finding that it was anything more than an executory contract of sale under which the title to the property had not passed from Bodkin to plaintiff at the time of the levy. In our opinion, the point is well taken. It is the well-settled law of this court that "where, by the agreement, the vendor is to do anything to the goods for the purpose of putting them into that state in which the purchaser is to be bound to accept them, or, as it is sometimes worded, 'into a deliverable state,' the performance of those things shall, in the absence of circumstances indicating a contrary intention, be taken to be a condition precedent to the vesting .of the property." See Restad v. Engemoen, supra, p. 148, 67 N. W. 1146. What circumstances are there in this case "indicating" such "contrary intention"? Simply the naked statement of the witnesses that Bodkin gave plaintiff a bill of sale of the flax, without a particle more of evidence to show what the contents of that bill of sale were, except what is hereinafter stated, while there is much evidence and many circumstances in the case to show that the transaction between them was merely an executory and provisional one. On the trial, Bodkin was called by plaintiff, and testified:

"Q. State what you did with the crop of flax by way of selling it, if you did sell it. A. Yes, sir. Q. To whom? A. I sold it to Leslie

Welter. Q. When? A. Some time in April, just before I put it in; the time I made my agreement for my groceries. Q. What was the consideration? A. It was in the neighborhood of five hundred dollars; didn't know but what I might want more or less groceries. * * * Q. When did he commence delivering you the goods? A. The first goods I got was about the first of April. Q. Did you continue to use goods from his store? A. Yes, sir. Q. Do you know about, as near as you can state, how many hundred dollars' worth of goods you had? A. I think about in the neighborhood of six hundred dollars. I could not say positively, because he rendered his bill monthly. Q. It overrun some what he paid for the flax? A. Yes, sir. * * * Q. Where was the bill of sale given? A. In Welter's store. Q. Was it given at the time of your talk with him about it and arrangement to give it? A. I told him I would get it written out or write it myself. Q. Who wrote it out? A. I wrote it out myself. Q. But not at the same time of the conversation you had with him when you agreed to give it? A. No, it was at the time we came in for more goods. Q. When did you have the first conversation with him about this bill of sale? A. About the first of April. Q. Tell me what this conversation was so far as it related to what was a sale of this crop. A. I went in and saw Mr. Welter, and asked him if he could furnish me some goods during the summer. I had a judgment over me on account of this plow company, and I wanted some groceries, and asked him if he would carry me, and asked him if a bill of sale of flax that would be put in on the north half of section seventeen would be satisfactory. I didn't make up my mind where I was going to put it in, but I knew it was on that half section; so he said it would be all right. I wanted about five hundred dollars, and told him I would fix up the judgment. Q. So he consented? A. Yes, sir. Q. It was to secure him, and he would advance you groceries? A. Yes, sir. Q. To what extent? A. Five hundred dollars. * * * Q. Was there any conversation at the time you gave him the bill of sale,—any further conversation? A. I handed him the bill of sale, and he read it over, and put it in the safe. I don't remember any other conversation. * * * Q. Suppose that the hail had destroyed this crop, you were still to pay Mr. Welter for the groceries? A. We had no such supposition. We didn't talk that over, or anything else. Certainly I calculate to pay my debts, if you fellows will let me."

Plaintiff testified in his own behalf as follows:

"Q. You know Bodkin? A. Yes, sir. Q. State what, if anything, was the business transaction you had with reference to this crop of flax on this particular quarter section, and when did it occur? A. Mr. Bodkin came to me along about the first of March or first of April, and told me he would want his groceries during the coming season, and wanted credit. I knew of a judgment being against him from the court preceding that, and he said there was a judgment against him for quite a large amount, but he had made arrangements with them

to wait until after harvest, and that he wanted to sell me part of his crop to buy his groceries with. He told me he was going to sow different kinds of grain, and I selected the flax. Q. And what particular place did you select? A. It was the flax to be sown on a certain half section. He didn't know which part it would be in, and he had so much seed, and that seed, I figured, would cover about so many acres, and he agreed to put that in as my crop. Q. State whether or not you delivered him any goods as consideration. A. Yes, sir. Q. How much was the consideration to be? A. Five hundred dollars' worth of groceries. Q. The consideration for the crop was $500 worth of groceries? A. Yes, sir. Q. Did you deliver the goods? A. I did. Q. State whether there was any writing or bill of sale given. A. Afterwards he came in, and gave me a bill of sale. I didn't at the time consider a bill of sale necessary, but he came in afterwards, and handed me a bill of sale. * * * Q. What proportion had been furnished [of the groceries] at the time of the levy? A. I don't remember. I think probably there had been nearly four hundred dollars' worth. * * * Q. Is that your customary way of doing business? A. No, sir; I never did that before; but I was speculating a little in flax." After stating that he searched for the bill of sale, and could not find it, he further testified: "Q. What was that bill of sale? A. I remember it contained a bill of sale of all the flax to be grown on the north half of section seventeen in this town and range,—the town Mr. Bodkin's farm is located in,—the land involved in this suit." He further testified that he could not state the contents of the bill of sale any further than he had already done; that it was not on a printed blank, but was all written, and expressed a consideration of $500. He further testified that at the time of the levy Bodkin turned over to him collateral notes to the amount of $200, and he collected a part of them. The witness further testified: "Q. When did he turn this over? A. I think at about the time of the levy. I told him I needed money, and it looked as if this was going to be tied up for a long time, and I wanted him to help me out; so he turned this over as additional collateral. Q. As collateral to the contract or bill of sale? A. Yes, sir."

This is all of the evidence that it is necessary to consider. It must be remembered that the prior conversations of the parties as to the contract they were making were all merged in the bill of sale. Plaintiff does not claim that he rented the ground from Bodkin. He claims that he bought the crop. When did the title to the property pass? It did not pass when the bill of sale was made, because it was not then in existence. There was nothing then in existence but the seed, which was not yet sown. Plaintiff does not claim that he bought that, and, even if he had, it would not entitle him to follow that seed into the crop, and claim the whole crop.

Calling the transaction a sale and the instrument a bill of sale did not make the contract an executed one, when the facts show that it was not. If the title did not pass when the bill of sale was made, when did it pass? We see nothing in the case which warrants a holding that it passed, or would pass, before the crop was threshed and ready for delivery. The levy was made prior to that. If the verdict in this case could be sustained, it would illustrate the beautiful uncertainty that in many cases would exist as to which of two parties is the owner of the personal property in question. There ought to be at least some general principles of law more definite and certain than the uncertain guess of the jury in each case. That guess ought to be confined to a much narrower range than it would be if this verdict could be sustained.

The judgment is reversed, and a new trial granted.